**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**

TYISHA BARBER,                              )        CASE NO: 1:16-CV-2436
on behalf of D.A.,                          )
                                            )        JUDGE JAMES S. GWIN
              Plaintiff,                     )
                                            )        MAGISTRATE JUDGE
        v.                                  )        JONATHAN D. GREENBERG
                                            )
COMMISSIONER OF SOCIAL SECURITY,            )
                                            )        **REPORT & RECOMMENDATION**
              Defendant.                     )

Plaintiff Tyisha Barber ("Barber") on behalf of her minor daughter, D.A., challenges the final decision of the Acting Commissioner of Social Security, Nancy A. Berryhill ("Commissioner"), denying D.A.'s claim for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act ("Act"), 42 U.S.C. § 1381 *et seq*.  This matter is before the undersigned United States Magistrate Judge pursuant to an automatic referral under Local Rule 72.2(b) for a Report & Recommendation.  For the reasons set forth below, the Magistrate Judge recommends that the Commissioner's final decision be VACATED and the case REMANDED for further consideration consistent with this decision.

## I.  PROCEDURAL HISTORY

In July 2013, Barber filed an application for SSI on behalf of her daughter D.A., a child under the age of eighteen, alleging a disability onset date of August 12, 2012 and claiming D.A. was disabled due to oppositional defiant disorder, attention deficit hyperactivity disorder, mood

1

disorder, and excessive anger.   (Tr. 48, 199, 288.)  The application was denied both initially and

upon reconsideration.  (Tr. 48, 99-109, 111-120, 121-131, 134-143.)  Barber timely requested an

administrative hearing. (Tr. 174.)

On June 4, 2015, an Administrative Law Judge ("ALJ") held a hearing during which

D.A., represented by counsel, and Barber testified.  (Tr. 69-97.)  Medical expert John DiTraglia,

M.D., also testified.  (*Id.*)  On July 20, 2015, the ALJ found D.A. did not have an impairment or

combination of impairments that met, medically equaled, or functionally equaled the listings.

(Tr. 48-68.)  The ALJ's decision became final on August 17, 2016 when the Appeals Council

denied further review.  (Tr. 1-3.)

## II. Evidence

*Personal Evidence*

D.A. was born in July 2005, and was a "school-age" child both at the time the application

was filed and on the date of the hearing, pursuant to 20 C.F.R. § 416.926a(g)(2).  (Tr. 51.)

*Relevant School Records and Medical Evidence*[1]

On October 12, 2012, D.A.'s first grade teacher Marybeth Wampleman completed a

Teacher Questionnaire regarding D.A.'s functioning.  (Tr. 246-253.)  In the domain of Acquiring

and Using Information, Ms. Wampleman concluded D.A. had an "obvious problem"[2] in the areas

---

[1] The Court's recitation of the record is not intended to be exhaustive and is limited to the evidence cited in the parties' Briefs on the Merits.  Moreover, as Barber's sole assignment error relates to the ALJ's determination that D.A. had a "less than marked" limitation in the domain of Caring for Yourself, the Court focuses its discussion of the record on this issue.

[2] The Teacher Questionnaire asks the teacher to rate the child's functioning in various areas according to the following scale: 1= "no problem," 2= "a slight problem," 3="an obvious problem," 4= "a serious problem," 5= "a very serious problem."  (Tr. 246-253.)

2

of (1) reading and comprehending written material, and (2) comprehending and doing math problems.  (Tr. 247.)  In the domain of Attending and Completing Tasks, she found D.A. had a "slight problem" in the areas of (1) completing class/homework assignments; (2) completing work accurately without careless mistakes; and (3) working at reasonable pace/finishing on time. (Tr. 248.)  In the domain of Interacting and Relating with Others, Ms. Wampleman found D.A. had an "obvious problem" in the areas of (1) seeking attention appropriately; (2) expressing anger appropriately; and (3) respecting/obeying adults in authority.  (Tr. 249.)  In addition, D.A. had a "slight problem" in the area of following rules.  (*Id*.)

In the domain of Caring for Yourself, Ms. Wampleman found D.A. had "an obvious problem" in the areas of (1) handling frustration appropriately; (2) identifying and appropriately asserting emotional needs; and (3) responding appropriately to changes in own mood. (Tr. 251.) She had a "slight problem" in using appropriate coping skills to meet the daily demands of a school environment.  (*Id*.)  Ms. Wampleman rated the frequencies of each of these problems as weekly.  (Tr. 246-253.)  In the "Additional Comments" section of the Questionnaire, Ms. Wampleman explained as follows:

> [D.A.] was able to read and write on grade level.  She often needed additional help with her math skills.  However, [D.A.]'s behavior was often disruptive in the classroom setting.  She would get easily upset and have outbursts of anger to the point where she needed to be removed from the classroom setting. [D.A.] did learn to correctly and calmly respond to consequences by giving her a lot of positive praise and allow[ing] her to be my special helper.  This seemed to completely change her behavior for the better.

(Tr. 253.)

On November 6, 2012, D.A.'s second grade teacher Kathleen Cornell completed a Teacher Questionnaire.  (Tr. 257-264.)  Ms. Cornell found D.A. had no problems in the domains

3

of Acquiring and Using Information, Moving About and Manipulating Objects, and Caring for Yourself.  (*Id*.)  She found D.A. had a "slight problem" in the areas of (1) focusing long enough to finish assigned activity or task; (2) refocusing to task when necessary; (3) changing from one activity to another without being disruptive; (4) completing class/homework assignments; (5) completing work accurately without careless mistakes; and (6) working without distracting self or others.  (Tr. 259.)  In this regard, Ms. Cornell noted that "[w]hen the child is on her medication, no problem attending to tasks. . . . When she has a disciplin [sic] problem, she tells me she is not on medication."  (*Id*.)  In the domain of Interacting and Relating with Others, Ms. Cornell found D.A. had a "slight problem" in the areas of seeking attention appropriately and following rules.  (Tr. 260.)

On October 21, 2013, D.A. presented to counselor Elizabeth Skok, M.A., P.C.C., M.T., at Signature Health for an assessment.  (Tr. 409-411.)  Barber reported D.A. had an imaginary friend and was hearing voices.  (Tr. 409.)  She identified the following concerning behaviors: slamming doors, yelling, physical and verbal aggression, not listening, throwing/breaking things, reporting voices "telling to do bad stuff," crying daily, wandering off in the grocery store, and leaving the house at night when not allowed outside.  (*Id*.)  Barber also reported D.A. had low appetite, difficulty sleeping, and bed wetting approximately twice a week.  (Tr. 410.)  D.A. reported crying often, feeling sad and worried, and "feeling embarrassed for crying and then getting angry."  (*Id*.)  Both Barber and D.A. denied that D.A. exhibited suicidal intent or self harm.  (Tr. 409.)  Ms. Skok found D.A.'s symptoms indicated diagnoses of adjustment disorder with mixed emotions and conduct; rule out ADHD; and rule out mood disorder not otherwise specified.  (Tr. 412.)  She referred D.A. for a psychiatric evaluation and individual therapy.  (*Id*.)

4

On October 28, 2013, D.A. presented to Deborah Brewster, M.D., for a Child Psychiatry

Initial Assessment.  (Tr. 413- 420.)  Dr. Brewster set forth D.A.'s history as follows:

> At age 4 years old, [D.A.] set a string on fire in the bathroom. She would push
> and pinch her little sister, throw things at her brother and tell him "I hate you."
> Mom thought her behavior was due to having a new baby in the home.  When
> she visited dad, she had an incident of sleepwalking and was holding a fork by
> her cousins bed.  When dad woke her up, she began crying.  When she was
> age 6 years old, she told mom she saw a man with a mask at the door with a
> gun.  She later retracted her statement, after they called the police.  At age 6
> years old, she was completely out of control, slamming doors, disrespectful,
> and was aggressive at home and at school.  In kindergarten and first grade,
> teachers reported she didn't listen, was not able to focus, got out of her seat a
> lot.  She saw Dr. Gabriel at UH who diagnosed her with ADHD, ODD, and
> mood disorder with anger problems.  She started risperdal 0.5mg qam for
> aggression, which helped in the morning, but not in the afternoon.  It was
> switched to vyvanse 20mg, and helped improve anger until about 2pm.  She
> was less aggressive until the medication wore off.  She will blame her
> behavior on a voice, "the devil in my head told me to."  She has an imaginary
> friend that she talks to and says the friend is mean to her.  * * *  Three
> months ago, her medication was switched to concerta 18mg daily and
> increased to 36mg daily. Mom reports the concerta worked until 2pm, but
> after it wore off she would become aggressive.  They attempted to start
> therapy at Applewood, however she was very anxious in the waiting room,
> screaming and the appointment had to be cancelled.  It was never rescheduled,
> she has never had therapy but mom would like her to have a therapist to
> address her mood, anxiety, and behavior. * * *

(Tr. 413.)  D.A. reported her mood is usually "mad," but she feels happy when she has her

medicine.  (Tr. 414.)  She admitted to feeling sad three times per week and recently told Barber

she felt depressed.  (*Id*.)  D.A. stated "in the summer she had thoughts of harming herself, but

had no plan." (*Id*.)

On mental status examination, Dr. Brewster noted D.A. was cooperative with good eye

contact.  (Tr. 417.)  No hyperactivity was observed.  (*Id*.)  D.A.'s mood was "happy currently but

usually sad or mad;" and her affect was full.  (*Id*.)  Her thought process was coherent, linear,

logical and goal directed, and she displayed appropriate thought content.  (*Id*.)  She denied

5

current hallucinations and denied suicidal ideation, intent, or plan.  (*Id.*)  D.A. did endorse

generalized anxiety and compulsive behaviors (i.e., locking the door 6-7 times per day, checking

the windows 3-4 times per day, checking the refrigerator frequently), but did not appear anxious

during the examination.  (Tr. 415, 417.)  She displayed full attention, fair judgment, and good

insight.  (Tr. 417-418.)  Barber indicated they had run out of Concerta two months previously.

(Tr. 418.)

Dr. Brewster diagnosed major depressive disorder, single, moderate; generalized anxiety

disorder; ADHD, combined type; and oppositional defiant disorder.  (Tr. 418.)  She assessed a

"CGAS" of 48.[3]  (*Id.*)  Dr. Brewster believed D.A.'s voices "are not true hallucinations, but

relate to her anxiety and she often uses the voice to excuse her aggressive behavior."  (*Id.*)  She

found D.A. "is at a low risk of harming herself or others, mom closely supervises."  (*Id.*)  In

particular, Dr. Brewster noted as follows:

> The patient presented at no immediate risk to self or others during this visit.
> [D.A.] denies thoughts, intent or plan to harm herself or others.  The guardian
> has no concerns regarding safety at this time and the patient agrees to inform
> their guardian in the future if they have thoughts, intent or plan to harm
> themselves or others.

---

[3] The parties do not specifically address this issue, but the Court notes Dr. Brewster's "CGAS" score for D.A appears to be a reference to the Children's Global Assessment Scale ("Children's GAS").  The Children's GAS was adapted from the Global Assessment Scale for adults.  *See* Schaffer, Gould, Brasic, Ambrosini, Fisher, Bird, and Aluwahlia, *"A Children's Global Assessment Scale (CGAS),"* Arch Gen Psychiatry, 1983; 40: 1228-1231.  It is a 100 point rating scale measuring psychological, social, and school functioning for children aged 6-17 with high scores indicating better functioning.  *Id.*  A Children's GAS score of 48 indicates a "moderate degree of interference in functioning in most social areas or severe impairment of functioning in one area, such as might result from, for example, suicidal preoccupations and ruminations, school refusal and other forms of anxiety, obsessive rituals, major conversion symptoms, frequent anxiety attacks, frequent episodes of aggressive or other antisocial behavior with some preservation of meaningful social relationships."  *Id.*

(Tr. 419.)  Dr. Brewster prescribed a trial of Zoloft, and indicated she would consider prescribing a stimulant after mood and anxiety improved and Risperdal "if aggression not improved with treatment of mood."  (*Id.*)

D.A. returned to Dr. Brewster on November 11, 2013.  (Tr. 421- 424.)  D.A. was still aggressive at home and school, but denied nightmares, hearing voices, and worrying. (Tr. 421.) D.A. also indicated she had stopped checking locks and opening/closing doors.  (*Id.*)  She also denied any thoughts, intent, or plan to harm herself or others.  (*Id.*)  Her sleep was poor, noting "she can't fall asleep until midnight or 1 a.m." (*Id.*)  Examination findings were largely similar to the previous visit.  (*Id.*) Dr. Brewster noted "some improvement in anxiety" and assessed a Children's GAS of 50.  (Tr. 422-423.)  She again found D.A. is "at low risk of harming herself or others, mom closely supervises."  (*Id.*)  Dr. Brewster continued D.A. on Zoloft and started her on Adderall and Melatonin.  (Tr. 423.)

On December 2, 2013, D.A.'s third grade teacher Holly Baaklini completed a Teacher's Questionnaire.  (Tr. 305-310.)  She noted D.A. was in a general education classroom and her reading and math scores placed her at the second grade level.  (Tr. 305-306.)  Ms. Baaklini indicated D.A. needed directions repeated and became restless during tests and quizzes.  (Tr. 306.)  She reported D.A. "interacts normally with her peers," but "at times, she can become upset and comes to me for help or to explain the situation." (Tr. 307.)  With regard to D.A.'s ability to cope with stress and changes in her environment, Ms. Baaklini found as follows:

> [D.A.] usually raises her hand each time we line up to express that she has a headache or needs an ice pack.  She is improving with only raising her hand in line when she absolutely needs something.  I help [D.A.] keep her desk organized.

(T. 307.)  She also noted "on the days [D.A.] says she takes her medicine, she seems less agitated

7

by her peers and more focused." (Tr. 308.)

D.A. returned to Dr. Brewster on February 20, 2014. (Tr. 440-443.) Barber reported D.A. had not taken her medication over the weekend. (Tr. 440.) She reported "an incident where [D.A.] walked out of the classroom and slammed the teacher's hand in the door." (*Id.*) D.A.'s teachers reported improved focus, but the medication seemed to wear off at noon. (*Id.*) D.A's mood had been "good," and Barber agreed there had been improvement with Zoloft. (*Id.*) D.A. denied worrying, having nightmares, or hearing voices. (*Id.*) She had no thoughts, intent, or plan to harm herself or others, and felt "less aggressive, and only with her sister since the change in medications." (*Id.*)

On examination, D.A. was cooperative and pleasant with good eye contact. (Tr. 441.) No hyperactivity was observed. (*Id.*) D.A.'s mood was happy and her affect was full. (*Id.*) Her thought process was coherent, linear, logical and goal directed, and she displayed appropriate thought content. (*Id.*) She denied hallucinations and anxiety, and denied suicidal ideation, intent, or plan. (*Id.*) She displayed full attention, fair judgment, and age appropriate insight. (*Id.*) Dr. Brewster found D.A. had improvement in mood and anxiety, with "some improvement" in focusing. (*Id.*) She concluded D.A. "is at low risk of harming herself or others, mom closely supervises." (*Id.*) Dr. Brewster assessed a Children's GAS of 50, continued D.A. on Zoloft and Melatonin, and increased her Adderall to target ADHD and aggression. (Tr. 442.)

On March 14, 2014, D.A.'s elementary school completed a Section 504 MultiDisciplinary Report. (Tr. 322-329.) The Report indicated D.A. had been assessed by a therapist from the Applewood Centers in February 2014 and found to have ADHD, combined

type.  (Tr. 322.)  The Applewood Centers Mental Health Assessment Services Report[4] noted

D.A. states she hears "scary male voices" in her head who tell her to be bad.  (Tr. 327.)  The

Report further indicated D.A.'s teachers reported D.A. was "oppositional, defiant, over-sensitive

to criticism, cries easily, seems depressed, and can be aggressive when angry."  (*Id*.)  Applewood

Centers diagnosed adjustment disorder with mixed emotions conduct; and ADHD, combined

type, secondary.  (Tr. 329.)  The examiner assessed a Children's GAS score of 50.  (Tr. 329.)

D.A.'s school concluded D.A. was eligible to receive Section 504 accommodations because her

ADHD hindered her ability to learn.  (Tr. 322.)

     D.A. returned to Dr. Brewster on April 3, 2014.  (Tr. 444- 452.)  Barber reported she had

found three days worth of D.A.'s medication in the trash.  (Tr. 450.)  When confronted, D.A.

refused to take her medication, claiming the pills were too large to swallow.  (*Id*.)  Barber

reported D.A.'s grades were declining and she was suspended two weeks previously for

throwing markers at her classmates.  (*Id*.)  According to Barber, D.A.'s teachers reported D.A. is

very calm in the mornings but has anger outbursts in the afternoon once her medication wears

off.  (*Id*.)  D.A. reported feeling happy and worrying less with Zoloft.  (*Id*.)  She denied any

thoughts, intent, or plan to harm herself or others; and denied hearing voices.  (*Id*.)

     Examination findings were the same as the previous visit.  (Tr. 450.)  Dr. Brewster

concluded D.A. did not have improvement with the increase in her Adderall dosage, noting it

"only lasts until 1 p.m., she is hyperactive, inattentive, and more aggressive."  (Tr. 451.)  She

did, however, find improvement in mood and anxiety with Zoloft.  (*Id*.)  Dr. Barber again noted

---

[4] The record does not appear to contain a complete copy of the Applewood Centers
Mental Health Assessment Service Report regarding D.A. The parties direct this Court's
attention to only two pages of an apparently nine page report.  (Tr. 327, 329.)

D.A. "is at low risk of harming herself or others, mom closely supervises." (*Id*.)  She assessed a current Children's GAS score of 50, continued D.A. on Zoloft and Melatonin, and adjusted her Adderall. (*Id*.)

On June 5, 2014, D.A. returned to Dr. Brewster for follow-up regarding her depression, anxiety, and ADHD.  (Tr. 453-459.)  Barber indicated D.A.'s teachers reported that, during the past month, D.A. had been agitated and not focused and, further, that she had thrown a chair at a peer.  (Tr. 457.)  Barber reported D.A. had been taking her medication, but was "crying more lately."  (*Id*.)  D.A. reported feeling "mad," but denied anxiety, nightmares, and suicidal thoughts, intent, or plan.  (*Id*.)  On examination, D.A. was cooperative and pleasant with good eye contact.  (*Id*.)  Her mood was "mad" and her affect was full.  (*Id*.)  Her thought process was coherent, linear, logical and goal directed, and she displayed appropriate thought content.  (*Id*.)  She denied hallucinations and anxiety, and denied suicidal ideation, intent, or plan.  (*Id*.)  She displayed full attention, fair judgment, and fair insight.  (Tr. 457-458.)

Dr. Brewster concluded D.A. did not improve with the adjustment to her Adderall, noting "aggression has increased."  (Tr. 458.)  However, Zoloft appeared to have improved D.A.'s anxiety and compulsive behaviors.  (*Id*.)  Dr. Brewster found [D.A.] "is at a low risk of harming herself or others, mom closely supervises."  (*Id*.)  She assessed a Children's GAS of 50, continued Zoloft and Melatonin, discontinued Adderall, and started D.A. on Vyvanse.  (*Id*.)

In July 2014, Barber reported D.A. "has not taken her medication in 2 weeks, she was spitting it in the garbage then refused to take the medication."  (Tr. 464.)  Dr. Brewster noted D.A. could "not give a reason why she didn't want to take the medications; she has no side effects."  (*Id*.)  D.A. threw a chair in daycare and threatened to punch the daycare teacher in the

10

mouth.  (*Id.*)  Barber reported that, two weeks previously, she found D.A. trying to strangle herself with a belt.  (*Id.*)  D.A. also stated "she wished she wasn't born."  (*Id.*)  D.A. denied she wanted to die, but was " really mad."  (*Id.*)  Barber agreed to take D.A. to the emergency room if this happened again.  (*Id.*)  D.A. denied having any worries or thoughts, intent, or plan to harm herself or others.  (*Id.*)  Examination were findings were the same as the previous month.  (Tr. 464-465.)

Dr. Brewster noted D.A. had not been medication compliant.  (Tr. 465.)  She stated "mom agrees to give medications to her daily and monitor that she has swallowed them." (*Id.*) Dr. Brewster again found D.A. is "at low risk of harming herself or others, mom closely supervises."  (*Id.*)  She assessed a Children's GAS of 50, and continued D.A. on Zoloft, Vyvanse, and Melatonin.  (*Id.*)

In October 2014, Barber reported D.A. had not missed any doses of her medication.  (Tr. 471.)  She noted D.A. was behind on her homework, and indicated D.A.'s teachers had reported D.A. was not focusing after lunch.  (*Id.*)  However, D.A.'s sleep was improved and Barber did not feel D.A. was depressed.  (*Id.*)  Barber felt "the medication is effective, but [D.A.] needs to work on her anger management."  (*Id.*)  She reported D.A. had been physically aggressive with her sister, but not at school.  (*Id.*)  D.A. stated her mood was "good," and denied depression, anxiety, and suicidal thoughts.  (*Id.*)  She reported she had recently put a bag over head but "not to kill myself, I was mad, I was in trouble."  (*Id.*)  Dr. Brewster again discussed with Barber "taking [D.A.] to the hospital if this happens again."  (*Id.*)

Examination findings were largely the same as in previous visits, with the exception that D.A.'s mood was described as "good" (as opposed to "mad").  (*Id.*)  Dr. Brewster concluded

11

[D.A.] "has been medication compliant, she has improvement in mood and anxiety with Zoloft, mom believes it is effective."  (Tr. 472.)  She again found D.A. "is at low risk of harming herself or others, mom closely supervises."  (*Id.*)  Dr. Brewster continued to assess a Children's GAS score of 50.  (*Id.*)  She continued D.A.'s Zoloft, discontinued the Melatonin, and increased the Vyvanse dosage.  (*Id.*)

In November 2014, Barber reported D.A. refused to take her medications on weekends. (Tr. 478.)  Her teachers indicated D.A. "does well in the morning, and behavior deteriorates in the afternoon."  (*Id.*)  Barber stated D.A. "threw a book and kicked a chair, hit a peer, was disrespectful and was suspended twice."  (*Id.*)  She also reported D.A. continued to be aggressive towards her sister.  (*Id.*)  D.A. refused to sleep in her own room.  (*Id.*)  Her grades were D's and Cs, with F's in math and reading.  (*Id.*)  D.A. indicated her mood was "happy, mad and sad." (*Id.*)  She denied any thoughts, intent, or plan to harm herself or others.  (*Id.*) Examination findings were largely normal, although Dr. Brewster noted D.A. displayed poor judgment and insight.  (Tr. 479.)  She assessed a Children's GAS of 50, adjusted D.A.'s medications, and found D.A. "is at low risk of harming herself or others, mom closely supervises."  (*Id.*)

On January 20, 2015, Dr. Brewster reported the following "Parent concerns:"

> [D.A.] has not been here since end of November and has not been medication compliant, ran out of medication one month ago.  She has poor behavior in the morning without her medication, doesn't complete work, "has a smart mouth." Appetite is poor, likes to eat only junk food.  Sleep is poor, refuses her melatonin, because she feels sleepy in the morning. . . . Mom feels she is irritable, but she has run out of Zoloft one month ago.  She denies depression, mood is "anxious," and she is worried about "my life."  She is worried about school.  She has no side effects.  She has been aggressive towards her sister, but not at school.  She has no thoughts, intent, or plan to harm herself or others. She has a school-based therapist from Applewood, Ms. Danny, sees her at least once per week and when she needs it at school.

12

(Tr. 485.)  Examination findings were normal, with the exception that Dr. Brewster noted D.A. "appeared tired today," had an "anxious" mood, and displayed poor judgment and insight.  (Tr. 486.)

Dr. Brewster noted D.A had not been medication compliant.  (Tr. 486.)  She found D.A. "had improvement in mood and anxiety with Zoloft, but without it, anxiety has increased."  (*Id*.)  Dr. Brewster concluded D.A. "is at low risk of harming self or others, mom closely supervises." (*Id*.)  She also found as follows:

> The patient presented as no immediate risk to self or others during this visit. [D.A.] denies thoughts, intent, or plan to harm herself or others.  The guardian has no concerns regarding safety at this time and the patient agrees to inform their guardian in the future if they have thoughts, intent, or plan to harm themselves or others.  The guardian has been instructed to take the patient to the ER if concerns develop regarding the safety of the patient or others.

(Tr. 487.)  Dr. Brewster assessed a Children's GAS of 50, and continued D.A. on her medications.  (*Id.*)

On March 26, 2015, D.A.'s fourth grade teacher Donna Sommer completed a Teacher's Questionnaire.  (Tr. 345- 349.)  She noted D.A. was in a regular education classroom, but "we are working towards having her put in a smaller classroom setting."  (Tr. 345.)  Ms. Sommer "noticed some limitations to [D.A.]'s learning ability with math," and stated "she does need reminders to focus and complete assignments." (Tr. 346-347.)  With regard to D.A.'s abilities to initiate and sustain emotional connections with others, comply with rules, and respond to criticism, Ms. Sommer found as follows:

> [D.A.] is very aware of the actions of her peers, she relates on a average level for a fourth grader.  She tends to have more problems with making friends due to her anger issues.  She generally complies, but there are times when she will refuse to follow instructions from teachers.

13

(Tr. 347.)  She also responded to the following question, as follows:

> 9.    Please comment on the child's ability to cope with stress and changes in
> his/her environment and the child's ability to take care of his/her own
> health, possessions and living area.
>
> > **ANSWER**:    [D.A.] does not adapt well to change in her environment.
> > Changes in the row usually causes her great difficulties
> > with adjustment.

(Tr. 348.)  Finally, Ms. Sommer observed that D.A. "can be an excellent citizen in the classroom

if it was a smaller setting," however, "her behavior and anger can often get in the way of her

learning."  (Tr. 349.)

Several months later, on June 1, 2015, Ms. Sommer submitted a letter regarding D.A.'s

behavior.  (Tr. 357-358.)  She noted D.A. had been suspended on four occasions during the

2014-2015 school year for disrespect to faculty/staff, fighting with another student, flipping over

a chair in anger, and leaving an assigned area and not returning.  (*Id*.)  Ms. Sommer indicated she

had sent messages to D.A.'s mother several times with behavior concerns such as : (1) "angry

that candy was taken away, threw book against the wall, flipped chair, slammed class door;" (2)

"disrespectful behavior towards teachers;" (3) "cell phone, not following procedures, carrying it

on her, and having it out in class;" (4) "off task, angry when recess was taken to complete

assignment;" (5) "lost her cellphone, angry and will not focus on work;" (6) "off task, loss of

recess to complete Science activity for a grade, angry and refusing to work;" (7) "inability to

ignore peers, laughing and off task constantly, and will not complete work;" (8) "refusal to take

off two baseball caps of the belt hoops of her pants, angry and wouldn't work on assignments;"

and (9) "walked out of Language Arts class without permission."  (*Id*.)  Ms. Sommer noted

"there have been anger issues and refusal to follow instructions from authority figures

14

throughout the school year." (*Id*.) She stated "it is not on a daily basis, but frequent enough to be a concern." (*Id*.)

***State Agency Opinions***

On November 30, 2012, D.A. underwent a consultative psychological examination with Michael Faust, Ph.D. (Tr. 397-403.) Barber also attended and provided information regarding D.A.'s condition. (*Id*.) D.A. was seven years old at the time and in the second grade. (Tr. 397-398.) Barber reported D.A. "demonstrated significant behavioral difficulties while in school" (including hitting the teacher, walking out of class, and humming while the teacher was trying to teach) and had been suspended three times. (Tr. 398.) She reported D.A. suffered from significant mood swings, frequent spontaneous tearful episodes, and was easily emotionally distraught, impulsive, and easily agitated. (Tr. 399.) Barber indicated D.A. screams, "throws stuff," breaks things, steals money, and is "physically violent and aggressive to family members." (*Id*.) She also advised Dr. Faust that D.A. "set the bathroom on fire and she looks for lighters to set fires" and, further, that she "recently caught [D.A.] setting pieces of plastic on fire." (*Id*.) She indicated D.A. choked her little sister and tells her siblings that she will kill them. (*Id*.) Finally, Barber reported D.A. wets the bed every night and occasionally urinates on herself during the day because "she doesn't feel like going to the bathroom." (Tr. 398-399.)

On mental status examination, Dr. Faust noted D.A. "did not cooperate with this examination in that she refused to put forth any effort to interact or complete mental status tests" and, in fact, "hid her face behind her jacket." (Tr. 400.) Dr. Faust indicated D.A. eventually answered some questions, but remained defiant and appeared angry. (*Id*.) When she did answer questions, she was curt and acted annoyed at having to talk. (*Id*.) D.A.'s speech was 100%

15

intelligible and her thoughts followed a logical, linear pattern.  (*Id.*)  She did not appear anxious,

but was angry and defiant and reported periods of "crying and sad moods as well as being easily

angered and annoyed."  (*Id.*)  Dr. Faust found D.A. "shows no suicidal or homicidal ideation,

prior attempts, or future plans for either act and she has never cut on herself."  (*Id.*)  D.A. did not

appear to be suffering from any auditory or visual hallucinations, although Barber did indicate

D.A. had two imaginary friends.  (Tr. 400-401.)  Dr. Faust noted D.A. was not distracted or

hyperactive.  (Tr. 401.)  Her level of insight and judgment was limited due to oppositional

defiant disorder and Dr. Faust found she "shows little concern about how her behavior impacts

others and is disrespectful to adults."  (*Id.*)

With regard to D.A.'s daily activities, Barber reported D.A. (1) refuses to get dressed to

go to school and, thus, is often tardy; and (2) refuses to do her chores which include cleaning her

room and straightening her toys.  (Tr. 401.)  Barber reported she had difficulty getting D.A. to go

to bed at night and that D.A. had "poor sleep patterns."  (Tr. 400-401.)  She indicated D.A. had

significant difficulty keeping friends because she "beats them up and tells them she doesn't like

them."  (Tr. 401.)  When Dr. Faust asked D.A. what she likes to do for fun, she stated "Nothing.

I hate everybody."  (Tr. 402.)

Dr. Faust diagnosed oppositional defiant disorder ("ODD"); mood disorder, not

otherwise specified; attention deficit hyperactivity disorder, combined type; and enuresis,

nocturnal. (Tr. 402.)  He assessed a Global Assessment of Functioning[5] ("GAF") of 55,

_____

[5]  Dr. Faust's report appears to reference the Global Assessment of Functioning (or
"GAF") scale for adults rather than the Children's GAS.  The GAF scale reports a clinician's
assessment of an individual's overall level of functioning.  An individual's GAF is rated between
0-100, with lower numbers indicating more severe mental impairments.  A score between 51 and
60 indicates moderate symptoms or moderate difficulty in social, occupational, or school

indicating moderate symptoms.  (*Id.*)  In his functional assessment, Dr. Faust described D.A.'s

abilities and limitations in self-care as follows:

> [D.A.] exhibits frustration when asked to do something and reacts by becoming
> oppositional, angry, and defiant.  She often will become aggressive and become
> involved in fights. [D.A.] is not independent in personal hygiene and often refuses
> to get dressed such that she is frequently tardy to school.  She reports poor
> sleeping patterns even with medication and continues to wet the bed.  She is
> capable of identifying her emotions, but will act out in frustration and anger and
> reports symptoms consistent with variable moods (mood disorder NOS).  In fact,
> she struggles to manage her emotional reactions when stressed, but also puts forth
> little effort to do so.

(Tr. 403.)

On December 17, 2012, state agency psychologist Kristen Haskins, Psy. D., reviewed

D.A.'s records and completed a Childhood Disability Evaluation.  (Tr. 104-105.)  Dr. Haskins

concluded D.A. had a marked limitation in the domain of Interacting and Relating with Others,

and less than marked limitations in the domains of Acquiring and Using Information, Attending

and Completing Tasks, and Caring for Yourself.  (*Id.*)  She found D.A. had no limitation in the

remaining domains of Moving About and Manipulating Objects and Health and Physical Well-

Being.  (*Id.*)  Dr. Haskins explained her assessment regarding the domain of Caring for Yourself

as follows:

**Caring for Yourself**

**Rating** : Less than Marked.

**Psychology**:   Current Teacher, no problem here
              CE Psych has diurnal enuresis, nightly; mom reported child has

---

functioning.  A recent update of the DSM eliminated the GAF scale because of "its conceptual
lack of clarity . . . and questionable psychometrics in routine practice."  *See Diagnostic and
Statistical Manual of Mental Disorders* (DSM-5) at 16 (American Psychiatric Ass'n, 5th ed.,
2013).

> significant mood swings; problems with sleep; frequent
> spontaneous tearful episodes, easily emotionally distraught and
> impulsive; easily agitated; frequently threatens to kill other
> people; hx of fire setting; physically violent and aggressive to
> family members; stole money; annoyed mood and affect.

(Tr. 105.)  On May 9, 2013, state agency psychologist Paul Tangeman, Ph.D., reviewed D.A.'s

records and reached the same conclusions as Dr. Haskins. (Tr. 116-117.)

On October 18, 2013, D.A. underwent a psychological consultative examination with J.

Joseph Konieczny, Ph.D.  (Tr. 405-407.)  Barber and D.A.'s grandmother also attended and

provided information regarding D.A.'s condition.  (*Id.*)  D.A. was eight years old at the time and

in the third grade.  (*Id.*)  Barber reported D.A. was diagnosed with ADHD at the age of seven,

and had been taking medication since then.  (*Id.*)  She indicated D.A. had a history of sleep

disturbance, bed wetting, and soiling episodes.  (*Id.*)  Barber reported D.A. "had been involved

in episdoes of intentional fire-setting," stating D.A. set fire to the bathroom at age six and the fire

department had to be called.  (*Id.*)  She had "also been involved in rough play with family pets,"

but had not killed any animals.  (*Id.*)  Barber reported D.A. was "very aggressive" with her

siblings, and exhibited "significant oppositional and defiant behaviors in home and school

settings."  (*Id.*)

On examination, Dr. Konieczny found as follows:

> * * * [D.A.] related very pleasantly and easily to the examiner.  She was
> cooperative in manner and responded readily to all questions and tasks posed
> to her.  Her ability to concentrate and to attend to task showed no indications
> of impairment.  She showed no symptoms of hyperactivity, restlessness, or
> inattentiveness.  She showed no indications of mood swing or mood
> disturbance.  [D.A.] did report a history of hearing voices that "tell me to do
> bad."  She indicated that this was "the devil's voice."  She has had these
> episodes "since I was six." [D.A.'s] mother indicated that she has heard [D.A.]
> talk about these episodes. [D.A.] also has a history of frequent significant
> temper and mood outbursts.  During the course of the evaluation, she showed

18

> no indications of any diminished tolerance for frustration.   No speech or
> articulation difficulties were noted. [D.A.'s] level of speech appeared to be
> adequate for an individual her age. * * *

(Tr. 406.)

Dr. Konieczny diagnosed mood disorder, not otherwise specified; ADHD, predominantly hyperative-impulsive type; enuresis, noctural only; and encopresis, without constipation or overflow incontinence.  (Tr. 407.)  He assessed a GAF of 42, indicating serious symptoms.  (*Id.*) In his functional assessment, he described his findings regarding the domain of self-care as follows: "As a result of her mood disorder and ADHD symptoms, [D.A.] would have diminished tolerance for frustration and diminished coping skills and would have limitations in these areas." (Tr. 407.)

On October 28, 2013, state agency psychologist Karla Voyten, Ph.D., reviewed D.A.'s records and completed a Childhood Disability Evaluation.  (Tr. 127-128.)  Dr. Voyten found D.A. had a marked limitation in the domain of Interacting and Relating with Others, and a less than marked limitation in the domain of Attending and Completing Tasks.  (*Id*.)  She concluded D.A. had no limitation in the remaining domains of Acquiring and Using Information, Moving About and Manipulating Objects, Caring for Yourself, and Health and Physical Well-Being. (*Id*.)

On December 24, 2013, state agency psychologist Carl Tischler, Ph.D., and state agency pediatrics John L. Mormol, M.D., reviewed D.A.'s records and completed a Childhood Disability Evaluation.  (Tr. 138-140.)  They reached the same conclusions as Dr. Voyten, with the exception that they concluded D.A. has a less than marked limitation in the domain of Health and Physical Well-Being.  (Tr. 139.)

***Hearing Testimony***

During the hearing, D.A. testified as follows:

- She is nine years old.  (Tr. 72.)  She had just finished her last day of school.  (Tr. 73.)  Her grades are "not good" because she has not been turning in her homework.  (Tr. 74.)  She does not like homework and has not been doing it. (*Id.*)  She thinks her report card will have Fs and Ds.  (*Id.*)

- She has gotten into trouble at school during the past year for throwing books and throwing a chair.  (Tr. 75.)  On two occasions, she was sent home for the rest of the day due to her behavior.  (*Id.*)

- She has no friends at school because "I fight a lot and they think I'm bad."  (Tr. 75-76.)  She does not know why she fights so much.  (Tr. 76.)

- She takes medication every day.  (Tr. 76-78.)  It "kind of" helps; i.e., sometimes it helps and sometimes it doesn't.  (Tr. 76-77.)  She takes her medication in the morning and it helps her feel calm.  (Tr. 77.)  However, the medication wears off by lunch time and then she is "bad a lot in class."  (*Id.*)  She talks out of turn and is disruptive.  (*Id.*)  Sometimes she is disruptive in the morning, even with her medication.  (*Id.*)

- She has one brother (age 13) and two sisters (ages 7 and 2).  (Tr. 78.)  She hits them and fights with them.  (Tr. 78-79.)

- She has no friends in the neighborhood because "they don't like [her.]"  (Tr. 79.)  She does not belong to any clubs or sports.  (*Id.*)  She gets along "okay" with adults, including her teachers.  (Tr. 79-80.)

- She goes to bed at 7:00 p.m., but does not sleep well at night.  (Tr. 79.)

The ALJ also asked Barber questions the hearing.  She testified as follows:

- "[D.A.] doesn't have any friends because she's very abusive towards her friends. I found two butcher knives and a steak knife up under her mattress, and she said she wanted to keep them under there because she wanted to protect herself from the people that don't like her, that think she's a bad person.  [D.A.] has also set a bathroom on fire in the house.  She has put a bag over her head and said she wanted to die.  She has choked herself with a belt.  My mom has to – I have to call my mother to help with [D.A.]  [D.A.] hits me back.  If I take her phone, she's bad because she throws stuff.  I just recently took the TV and she got mad and knocked the TV off the table that I had it sitting on so now the TV is completely cracked. . . . I just – I can't keep a job because I'm always getting called that I have to come get [D.A.] for emergency removal from school.  At one point she will take her medication and spit it out and hide it up under the garbage

20

bag in the bathroom."  (Tr. 82.)

•      D.A. takes Zoloft for anxiety, Vyvanse, Adderall, and melatonin.  (Tr. 83.)  Her
medications have been adjusted on several occasions.  (*Id*.)  D.A. is taking her
medications now.  (Tr. 82.)  Barber stands there and checks to make sure D.A.
swallows her medication.  (*Id*.)

•      D.A. sees a therapist, a counselor at school, and Dr. Brewster at Signature Health.
(Tr. 83.)

•      D.A. does not get along with her siblings.  (Tr. 83.)  She smacks her little sister
for no reason.  (Tr. 84.)  She hits and kicks.  (*Id*.)  She "throws stuff" and breaks
everything, including her toys and phone.  (Tr. 85-86.)  There are holes in the
wall from where D.A. punched it.  (Tr. 85.)  D.A. has chores but does not do
them.  (*Id*.)

•      D.A. hears voices.  (Tr. 84.)  She has climbed into the washer and dryer to protect
herself from the "people that don't like her."  (*Id*.)

•      D.A. was suspended from school four or five times during the 2014-2015 school
year.  (Tr. 86.)  She was suspended for walking out of class, threatening to punch
a teacher in the face, throwing a chair at a teacher, throwing books at a teacher,
and slapping a little boy.  (Tr. 86-87.)  She is easily distracted.  (Tr. 87.)  She got
an F in math and science, two Ds, and a C in art.  (Tr. 87.)

Medical expert John DiTraglia, M.D., also testified at hearing.  (Tr. 90-94.)  He

diagnosed D.A. with ADHD, mood disorder, and oppositional defiant disorder, but indicated her

conditions did not meet, equal, or functionally equal any of the Listings.  (Tr. 90-91.)  With

regard to the six domains, Dr. DiTraglia testified as follows:

> Acquiring information, no evidence of limitation.  Attending and completing
> tasks, she does carry a diagnosis of ADHD, but I don't think that's her biggest
> problem, and it's less than marked.  Interacting, relating with others would
> appear to be her biggest problem.  The testimony today from the mother is
> pretty horrendous.  I'm not sure I saw that reflected in the medical records, but
> it – so that would be marked.  Moving about and manipulating objects, no
> evidence of limitation.  Caring for herself is impacted by her behavior probably
> to some extent, but it's less than marked.  And health and physical well-being,
> she's otherwise healthy and has no other limitations.

(Tr. 91.)

21

In response to questioning from counsel, Dr. DiTraglia acknowledged he was not a psychiatrist or psychologist and did not, as a general rule, treat people with psychiatric issues. (Tr. 91-92.)  He did state, however, that he had "a lot of experience" with children with ADHD and behavior problems, and "some experience" with children with mood disorders, oppositional defiant disorder, and general anxiety disorder.  (Tr. 92-93.)  When asked about the Global Assessment of Functioning scores in the record, Dr. DiTraglia indicated he was "not quite sure what to make of" those scores and did not specifically know what they meant.  (Tr. 92, 93.)  He then testified as follows:

> Q:    Okay.  So if Dr. Koneshny [sic] in Exhibit 4F noted that she has
>         diminished tolerance for frustration and diminished coping skills, would
>         that fall under the area of caring for self?
>
> A:    No.

(Tr. 93-94.)

### III.  Standard for Disability

To qualify for SSI benefits, an individual must demonstrate a disability as defined under the Act.  "An individual under the age of 18 shall be considered disabled ... if that individual has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S .C. § 1382c(a)(3)(C).

To determine whether a child is disabled, the regulations prescribe a three-step sequential evaluation process.  20 C.F.R. § 416.924(a).  At step one, a child must not be engaged in "substantial gainful activity."  20 C.F.R. § 416.924(b).  At step two, a child must suffer from a

22

"severe impairment."  20 C.F.R. § 416.924(c).  At step three, disability will be found if a child

has an impairment, or combination of impairments, that meets, medically equals or functionally

equals an impairment listed in 20 C.F.R. § 404, Subpt. P, App'x 1; 20 C.F.R. § 416.924(d).

To determine whether a child's impairment functionally equals the listings, the

Commissioner will assess the functional limitations caused by the impairment.  20 C.F.R. §

416.926a(a).  The Commissioner will consider how a child functions in six domains: (1)

acquiring and using information; (2) attending and completing tasks; (3) interacting and relating

with others; (4) moving about and manipulating objects; (5) caring for [ ]self; and (6) health and

physical well-being.  20 C.F.R. § 416.926a(b)(1)(i)-(vi).  If a child's impairment results in

"marked" limitations in two domains, or an "extreme" limitation in one domain, the impairments

functionally equal the listings and the child will be found disabled.  20 C.F.R. § 416.926a(d).  To

receive SSI benefits, a child recipient must also meet certain income and resource limitations.

20 C.F.R. §§ 416.1100, 416.1201.

A "marked" limitation is one which seriously interferes with functioning.  20 C.F.R. §

416.926a(e)(2)(i).  "Marked" limitation means "more than moderate" but "less than extreme."

20 C.F.R. § 416.926a(e)(2)(i).  "It is the equivalent of the functioning we would expect to find

on standardized testing with scores that are at least two, but less than three, standard deviations

below the mean."  *Id.*

An "extreme" limitation is one that "interferes very seriously with [a child's] ability to

independently initiate, sustain, or complete activities."  20 C.F.R. § 416.926a(e)(3)(i).  An

"extreme" limitation means "more than marked."  20 C.F.R. § 416.926a(e)(3)(I).  "It is the

equivalent of the functioning we would expect to find on standardized testing with scores that

are at least three standard deviations below the mean."  *Id.*

If an impairment is found to meet, or qualify as the medical or functional equivalent of a listed disability and the twelve-month durational requirement is satisfied, the claimant will be deemed disabled.  20 C.F.R. § 416.924(d)(1).

### IV.  Summary of Commissioner's Decision

The ALJ made the following findings regarding D.A. in the July 20, 2015 decision:

1. [D.A.] was born on July *** 2005.  Therefore, she was a school-age child on July 29, 2013, the date application was filed, and is currently a school-age child (20 CFR 416.926a(g)(2)).

2. [D.A.] has not engaged in substantial gainful activity since July 29, 2013, the application date (20 CFR 416.924(b) and 416.971 *et seq.*)

3. [D.A.] has the following severe impairments: opposition defiant disorder; attention deficit hyperactivity disorder; mood disorder; major depressive disorder; and generalized anxiety disorder (20 CFR 416.924(c)).

4. [D.A.] does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.924, 416.925, and 416.926).

5. [D.A.] does not have an impairment or combination of impairments that functionally equals the severity of the listings (20 CFR 416.924(d) and 416.926a).

6. [D.A.] has not been disabled, as defined in the Social Security Act, since July 29, 2013, the date the application was filed (20 CFR 416.924a).

(Tr. 48-63.)  The ALJ found D.A. had a marked limitation in the domain of Interacting and Relating with Others.  (Tr. 59-60.)  He further found she had "less than marked" limitations in domains of Attending and Completing Tasks, and Caring for Yourself.  (Tr. 58-59, 61-62.) Finally, the ALJ found D.A. had no limitations in the remaining domains of Acquiring and Using Information, Moving About and Manipulating Objects, and Health and Physical Well-Being. (Tr. 57-58, 60-62.)

### V.  Standard of Review

This Court's review is limited to determining whether there is substantial evidence in the record to support the ALJ's findings of fact and whether the correct legal standards were applied. *See Elam v. Comm'r of Soc. Sec.*, 348 F.3d 124, 125 (6th Cir.2003) ("decision must be affirmed if the administrative law judge's findings and inferences are reasonably drawn from the record or supported by substantial evidence, even if that evidence could support a contrary decision."); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir.1983).  Substantial evidence has been defined as " 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' "  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir.2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir.1994)).

The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion.  *Buxton v. Halter*, 246 F.3d 762, 772–3 (6th Cir.2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir.1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389–90 (6th Cir.1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.  *See Key v. Callahan*, 109 F.3d 270, 273 (6th Cir.1997).")  This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference.  *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir.1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied.

25

Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal.  *See, e.g., White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.")

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result."  *Fleischer v. Astrue*, 774 F.Supp.2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir.1996); accord *Shrader v. Astrue*, 2012 WL 5383120 (E.D. Mich. Nov.1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, 2011 WL 6130824 (S.D. Ohio Nov.15, 2011); *Gilliam v. Astrue*, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI. Analysis

### Functional Equivalence

Barber argues the ALJ erred in finding D.A.'s impairments were not functionally equivalent to a listing at step three of the sequential evaluation.  Specifically, she maintains substantial evidence does not support the ALJ's conclusion that D.A. had "less than marked" limitations in the domain of Caring for Yourself.  (Doc. No. 13.)  The Commissioner argues substantial evidence supports the ALJ's determination that D.A.'s mental impairments did not

functionally equal the Listings.  (Doc. No. 15.)

To functionally equal the listings, an impairment(s) must be of listing-level severity; i.e. it must result in "marked" limitations in two domains of functioning or an "extreme" limitation in one domain.  *See* 20 C.F.R. § 416.926a(a); Social Security Ruling ("SSR") 09–1p, 2009 WL 296031 (February 17, 2009).  In determining whether a child has a "marked" or "extreme" limitation, the Agency will:

> ... consider your functional limitations resulting from all of your impairments, including their interactive and cumulative effects. We will consider all the relevant information in your case record that helps us determine your functioning, including your signs, symptoms, and laboratory findings, the descriptions we have about your functioning from your parents, teachers, and other people who know you, and the relevant factors explained in §§ 416.924a, 416.924b, and 416.929.

20 C.F.R. § 926a(e).  The factors set forth in §§ 416.924a, 416.924b, and 416.929 include, but are not limited to the following: how well a child can initiate and sustain activities; how much extra help a child needs; the effects of structured or support settings; how a child functions in school; and the effects of medications or other treatment.  *See* 20 C.F.R. § 416.926a(a).  In determining whether a child functionally equals a listing, ALJs need not discuss all of the considerations set forth in 20 C.F.R. § 926a and SSR 09–1p; however, they must "provide sufficient detail so that any subsequent reviewers can understand how they made their findings." SSR 09–1p.[6]

---

[6] In assessing functional equivalence, the Agency employs a "whole child" approach. Under this approach, "[w]e focus first on the child's activities, and evaluate how appropriately, effectively, and independently the child functions compared to children of the same age who do not have impairments.  20 CFR § 416.926a(b) and (c). We consider what activities the child cannot do, has difficulty doing, needs help doing, or is restricted from doing because of the impairments. 20 CFR 416.926a(a).  Activities are everything a child does at home, at school, and in the community, 24 hours a day, 7 days a week."  SSR 09–2p, 2009 WL 396032 (February 18, 2009).  The Agency next evaluates the effects of a child's impairments by rating the degree to

The domain of Caring for Yourself considers "how well you maintain a healthy emotional and physical state, including how well you get your physical and emotional wants and needs met in appropriate ways; how you cope with stress and changes in your environment; and whether you take care of your own health, possessions, and living area."  20 CFR § 416.926a(k). As a general description of this domain, the regulations provide as follows:

1) General.

(i) Caring for yourself effectively, which includes regulating yourself, depends upon your ability to respond to changes in your emotions and the daily demands of your environment to help yourself and cooperate with others in taking care of your personal needs, health and safety. It is characterized by a sense of independence and competence. The effort to become independent and competent should be observable throughout your childhood.

(ii) Caring for yourself effectively means becoming increasingly independent in making and following your own decisions. This entails relying on your own abilities and skills, and displaying consistent judgment about the consequences of caring for yourself. As you mature, using and testing your own judgment helps you develop confidence in your independence and competence. Caring for yourself includes using your independence and competence to meet your physical needs, such as feeding, dressing, toileting, and bathing, appropriately for your age.

(iii) Caring for yourself effectively requires you to have a basic understanding of your body, including its normal functioning, and of your physical and emotional needs. To meet these needs successfully, you must employ effective coping strategies, appropriate to your age, to identify and regulate your feelings, thoughts, urges, and intentions. Such strategies are based on taking responsibility for getting your needs met in an appropriate and satisfactory manner.

(iv) Caring for yourself means recognizing when you are ill, following recommended treatment, taking medication as prescribed, following safety rules, responding to your circumstances in safe and appropriate ways, making decisions that do not endanger yourself, and knowing when to ask for help from others.

---

which the impairment(s) limits functioning in the six domains.  SSR 09–2p.

28

20 C.F.R. § 416.926a(k)(1).

      With regard to school age children such as D.A, the Agency considers a child's

functioning in this domain in the following context:

> (iv) School-age children (age 6 to attainment of age 12). You should be
> independent in most day-to-day activities (e.g., dressing yourself, bathing
> yourself), although you may still need to be reminded sometimes to do these
> routinely. You should begin to recognize that you are competent in doing
> some activities and that you have difficulty with others. You should be able to
> identify those circumstances when you feel good about yourself and when you
> feel bad. You should begin to develop understanding of what is right and
> wrong, and what is acceptable and unacceptable behavior. You should begin
> to demonstrate consistent control over your behavior, and you should be able
> to avoid behaviors that are unsafe or otherwise not good for you. You should
> begin to imitate more of the behavior of adults you know.

20 C.F.R. § 416.926a(k)(2)(iv).  Examples of limitations in this domain include, but are not

limited to: continuing to place non-nutritive or inedible objects in his/her mouth; using self-

soothing activities showing developmental regression (e.g., thumbsucking, re-chewing food), or

having restrictive or stereotyped mannerisms (e.g., body-rocking, headbanging); failing to dress

or bathe appropriately for his/her age because of an impairment that affects this domain;

engaging in self-injurious behavior (e.g., suicidal thoughts or actions, self-inflicted injury, or

refusal to take medication) or ignoring safety rules; failing to spontaneously pursue enjoyable

activities or interests; and evidence of a disturbance in eating or sleeping patterns.  20 C.F.R. §

416.926a(k)(3).  These examples do not describe a specific degree of limitation in this domain.

*Id.*

      Further guidance regarding the domain of Caring for Yourself is provided in Social

Security Ruling ('SSR") 09-7p, 2009 WL 396029 (February 17, 2009).[7]  Therein, the Agency

explains that "in 'Caring for Yourself,' we focus on how well a child relates to self  by

maintaining a healthy emotional and physical state in ways that are age-appropriate and in

comparison to other same-age children who do not have impairments."  SSR 09-07p, 2009 WL

396029 at *2 (emphasis in original).  With regard to a child's ability to regulate his/her

emotional wants and needs, the Agency explains as follows:

> Children must learn to recognize and respond appropriately to their feelings in
> ways that meet their emotional wants and needs; for example, seeking comfort
> when sad, expressing enthusiasm and joy when glad, and showing anger
> safely when upset.  To be successful as they mature, children must also be
> able to cope with negative feelings and express positive feelings
> appropriately.  In addition, after experiencing any emotion, children must be
> able to return to a state of emotional equilibrium.  The ability to experience,
> use, and express emotion is often referred to as self-regulation.  Children
> should demonstrate an increased capacity to self-regulate as they develop.

*Id.* at * 3 (emphasis in original.)  With regard to a child's ability to regulate his/her physical

wants and needs, the Agency explains this domain "involves the emotional ability to engage in

self-care activities, such as feeding, dressing, toileting, and maintaining hygiene and physical

health."  *Id*.  Taking care of physical needs also includes other aspects of self-care, such as

following safety rules, asking for help when needed, responding to circumstances in safe and

appropriate ways, and making decisions that do not endanger oneself.  *Id*. at 3-4.

     Here, the ALJ discussed D.A.'s functioning in the domain of Caring for Yourself as

---

     [7]  SSR's "are binding on all components of the Social Security Administration" and
"represent precedent final opinions and orders and statements of policy and interpretations"
adopted by the agency.  20 C.F.R. § 402.35(b)(1).  While SSR's do not have the force of law,
they are an agency's interpretation of its own regulations and "entitled to substantial deference
and will be upheld unless plainly erroneous or inconsistent with the regulation."  *Kornecky v.
Comm'r of Social Security*, 167 Fed. Appx. 496, 498 (6th Cir. 2006).

follows:

> [D.A.] has less than marked limitation in the ability to care for herself.
>
> The consultative psychologist indicated that it was reported [D.A.] had diurnal enuresis, nightly.  [D.A.] had significant mood swings, difficulty sleeping, frequent spontaneous tearful episodes, easily emotionally distraught and impulsive; easily agitated; frequently threatens to kill other people; history of fire setting; physically violent and aggressive to family members; stole money; and she had an annoyed mood and affect.
>
> The testimony revealed [D.A.] hears voices.  She put a plastic bag over her head wishing she would die.  She crawled into a washer and dryer to get away from the voices and her enemies.  However, the medical record shows Dr. Brewster determined in January 2015 that [D.A.] was not a risk to herself or others.

(Tr. 62.)

The Court finds the ALJ did not provide a sufficient analysis of this domain.  The sole reason provided by the ALJ for finding D.A. less than marked in the domain of Caring for Yourself is that "Dr. Brewster determined in January 2015 that [D.A.] was not a risk to herself or others."  (Tr. 62.)  The domain of Caring for Yourself, however, is not simply concerned with whether a child poses a risk of harm to herself or others.  Rather, as noted at length above, the this domain assesses a variety of behaviors and skills, including a child's ability to maintain a healthy emotional state through self-regulation of his/her emotions.  As explained in 20 CFR § 416.926a(k) and SSR 09-07p, this includes an assessment of a child's ability to cope with stress and frustration, handle changes in his/her environment, express anger safely when upset, and return to a state of emotional equilibrium after experiencing strong emotions.  *See* SSR 09-07p, 2009 WL 396029 at * 3.  This domain also evaluates a child's ability to regulate his/her physical needs in a healthy way and considers whether a child follows safety rules, refuses to take medication, responds to circumstances in safe and appropriate ways, and exhibits sleep

and/or eating disturbances.  *Id*. at *3-4.  Here, although the ALJ recites some of the record evidence regarding these issues at various points in the decision, the ALJ fails to meaningfully analyze this evidence or discuss how, in light of this evidence, he reached the conclusion that D.A. had a "less than marked" limitation in the context of the domain of Caring for Yourself.

This is problematic as the record is replete with evidence of D.A.'s difficulties in maintaining a healthy emotional state, including evidence regarding her problems handling frustration and stress, coping with change, and maintaining "emotional equilibrium."  For example, psychological consultative examiner Dr. Faust found D.A. "exhibits frustration when asked to do something and reacts by becoming oppositional, angry, and defiant."  (Tr. 403.)  He further noted she is "capable of identifying her emotions, but will act out in frustration and anger" and "struggles to manage her emotional reactions when stressed."  (*Id*.)  Consultative examiner Dr. Konieczny similarly concluded D.A. "would have diminished tolerance for frustration and diminished coping skills."  (Tr. 407.)  D.A.'s fourth grade teacher, Ms. Sommer, noted D.A. "does not adapt well to change in her environment," stating "changes in the row usually causes her great difficulties with adjustment."  (Tr. 348.)  Treatment notes contain repeated references to D.A.'s emotional outbursts, crying spells, tantrums, defiant behavior, and aggression, as well as her continued struggles to control her anger and frustration.  (Tr. 413, 415, 440, 327, 450, 457, 464, 478, 357-358.)  School records indicate D.A. was suspended on four occasions during the 2014-2015 school year for, among other things, flipping over a chair in anger and leaving an assigned area and not returning, each of which are arguably relevant to her ability to follow safety rules and respond to circumstances in safe and appropriate ways. (Tr. 357-358.)  The ALJ recites some of this evidence in the decision, but does not sufficiently

analyze it in the context of evaluating D.A.'s degree of limitation in the specific domain of

Caring for Yourself.  Indeed, it is unclear whether the ALJ considered the evidence regarding

her ability to maintain a healthy emotional state (i.e., handle stress and frustration, cope with

change, and maintain emotional equilibrium) as it relates to this particular domain.

The ALJ also failed to sufficiently analyze the evidence regarding a number of other

behaviors relevant to self-care.  As noted above, the domain of Caring for Yourself includes an

assessment of a child's ability to regulate her physical needs in a healthy way and considers

such issues as whether the child refuses to take medication, responds to circumstances in safe

and appropriate ways, and exhibits sleep and/or eating disturbances.  Here, there is evidence

D.A. exhibited significant difficulties in all three of these areas.  Dr. Brewster's treatment

records document repeated instances of D.A.'s refusal to take her medications, despite the fact it

was helping control her anxiety, depression, and sleep issues.  For example, in April 2014,

Barber reported she had found three days worth of D.A.'s medications in the trash.  (Tr. 450.)

When she confronted D.A., D.A. refused to take her medication.  (*Id*.)  In July 2014, Barber

reported D.A. "has not taken her medication in 2 weeks, she was spitting it in the garbage then

refused to take the medication."  (Tr. 464.)  During that same visit, Barber reported D.A. threw

a chair in daycare, tried to strangle herself with a belt, and stated "she wished she hadn't been

born."  (*Id*.)  In November 2014, Barber reported D.A. refused to take her medications on

weekends and noted D.A. had thrown a book, kicked a chair, was disrespectful, and was

suspended twice.  (Tr. 478.)  In January 2015, Dr. Brewster noted D.A. had not taken her

medication for the previous month and shown poor behavior, poor appetite, and poor sleep.  (Tr.

485.)  The ALJ does not address D.A.'s repeated refusals to take her medication in the context

33

of analyzing the domain of Caring for Yourself.

Nor does the ALJ address the voluminous evidence in the record of D.A.'s problems with responding to circumstances in "safe and appropriate ways."  As has been noted previously, the record contains evidence D.A. engaged in numerous unsafe behaviors, including attempting to strangle herself with a belt, hiding knives under her mattress and climbing into the washer/dryer to "protect herself from the people that don't like her," putting a bag over her head, punching the wall, and intentionally setting fires.  (Tr. 82, 84, 85, 359, 413, 415, 464, 471.)  Dr. Brewster expressly found D.A. "displays aggressive episodes that are out of proportion to precipitating stressor" and "fails to resist aggressive impulse and this results in serious assaultive act or destruction of property."  (Tr. 415.)  While the ALJ notes Dr. Brewster found D.A. was "not a risk to herself or others," the decision makes no attempt to reconcile this conclusion with the evidence of D.A.'s numerous self-destructive and dangerous behaviors.

Finally, the ALJ does not sufficiently analyze a variety of other issues relevant to this domain, including evidence of D.A.'s sleep problems, bed wetting, and refusal to get dressed in the morning (resulting in excessive tardiness at school.)  Treatment records document consistent complaints that D.A. suffered from sleep disturbances.  (Tr. 414, 421, 478, 485.)  Dr. Brewster prescribed melatonin, which appeared to help resolve this problem; however, there is evidence D.A. refused to take this medication.  (Tr. 485.)  The record also contains evidence D.A. had problems with her appetite, and experienced frequent episodes of bed wetting and soiling.  *See e.g.* Tr.  398 -399 ("[D.A.] suffers from diurnal enuresis.  Mother reported that she wets the bed every night and will occasionally urinate on herself during the day because she 'doesn't feel like going to the bathroom.'")  *See also* Tr. 406, 414, 485.  Additionally, the record contains

34

notations that D.A. refused to get dressed in the morning, resulting in her frequently being tardy for school.  *See e.g.*, Tr. 401.  In a teacher questionnaire, Ms. Sommer indicated D.A. was tardy 50 times during the 2014-2015 school year.  (Tr. 346.)

As noted above, the regulations provide that "[c]aring for yourself includes using your independence and competence to meet your physical needs, such as feeding, dressing, toileting, and bathing, appropriately for your age."  20 C.F.R. § 416.926a(k)(1)(ii).  They also provide that "[y]ou should be independent in most day-to-day activities (e.g., dressing yourself, bathing yourself), although you may still need to be reminded sometimes to do these routinely."  20 C.F.R. § 416.926a(k)(2)(iv).  *See also,* SSR 09-01p (explaining that difficulty sleeping due to anxiety or hypervigilance, irritability due to lack of sleep, crying when time to leave to school are relevant to domain of Caring for Yourself).  The ALJ does not meaningfully evaluate the record evidence relating to these issues (i.e., D.A.'s sleep problems, bed wetting, and refusal to get dressed in the morning) in the context of the self-care domain.

The Commissioner argues remand is not required because the ALJ's evaluation of this domain is supported by "the opinions of four separate state agency reviewing physicians, a medical expert, an examining physician, and D.A.'s first grade and second grade teachers, *none* of whom listed marked limitations in this domain."  (Doc. No. 15) (emphasis in original).  For the following reasons, the Court finds this argument is without merit.

In evaluating the medical opinion evidence, the ALJ accorded the greatest weight to the opinion of medical expert Dr. DiTraglia.  (Tr. 56.)  He weighed Dr. DiTraglia's opinion as follows:

> As for the opinion evidence, I give great weight to the testimony of Dr. DiTraglia, the medical expert.  He opined [D.A.] had no limitation in the

> functional domains of acquiring and using information, moving about and
> manipulating objects, and in health and physical well-being.  She had less than
> marked functional limitations in attending and completing tasks and caring for
> self.  She had a marked functional limitation in interaction and relating with
> others.

(Tr. 56.)  The ALJ does not offer any further evaluation or discussion of Dr. DiTraglia's opinion

in the decision, either generally or specifically with respect to the domain of Caring for

Yourself.

The Court finds the ALJ's reliance on Dr. DiTraglia's opinion is misplaced.  At the

hearing, Dr. DiTraglia was asked about the report prepared by consultative examiner Dr.

Konieczny, who stated D.A. "would have diminished tolerance for frustration and diminished

coping skills."  (Tr. 93-94, 407.)  Barber's counsel asked Dr. DiTraglia whether D.A.'s

diminished tolerance for frustration and diminished coping skills would fall "under the area of

caring for self."  (Tr. 93-94.)  Dr. DiTraglia responded, "No."  (*Id.*)  Dr. DiTraglia is clearly

mistaken.  As Barber correctly notes, the regulations expressly provide that the domain of

Caring for Yourself considers "how well you maintain a healthy emotional and physical state,

including . . . .**how you cope with stress and changes in your environment** . . . ."  20 CFR §

416.926a(k) (emphasis added).  Dr. DiTraglia's opinion that D.A. had "less than marked"

limitations in the domain of self-care, therefore, is based on a misunderstanding of the nature of

this domain and fails to reflect due consideration of D.A.'s difficulties in coping with stress and

frustration.

Dr. DiTraglia's lack of knowledge and understanding regarding this domain is

particularly significant in light of the plethora of evidence regarding D.A.'s serious difficulties

in this area (discussed *supra*).  Moreover, the ALJ does not acknowledge or address this

deficiency in Dr. DiTraglia's opinion at any point in the decision.  Given that, and combined with the fact the ALJ's discussion of the domain of Caring for Yourself fails to include any mention or evaluation of D.A.'s difficulties in handling stress and frustration, the Court cannot find Dr. DiTraglia's opinion supports the ALJ's determination that D.A. had less than marked limitations in the domain of Caring for Yourself.

The Commissioner argues any error in the ALJ's reliance on Dr. DiTraglia's opinion is harmless because the ALJ's finding is supported by the opinions of all four state agency record-reviewing physicians, Drs. Haskins, Tangeman, Voyten, and Tischler.  (Doc. No. 15 at 11-12.) The ALJ discussed the state agency opinions as follows:

> I give some weight to the residual functional capacity conclusions reached by the medical and psychological consultants employed by the State Disability Determination Services (Ex. 8A, pp. 5-7).  Their assessment supported a finding of "not disabled."  Although those physicians were non-examining, and therefore their opinions do not as a general matter deserve as much weight as those of examining or treating physicians, those opinions do deserve some weight, particularly in a case like this in which there exist a number of other reasons to reach similar conclusions.  They determined [D.A.] had no functional limitation in the domains of acquiring and using information, moving about and manipulating objects, and caring for self. [D.A.] had less than marked functional limitation in attending and completing tasks and in health and physical wellbeing. She had a marked functional limitation in interacting and relating to others.  The updated evidence changed the assessment somewhat.

(Tr. 56.)  In the above discussion, the ALJ cites only to the opinions set forth in Exhibit 8A pages 5-7, which corresponds to the December 2013 opinions of psychologist Dr. Tischler and pediatrician Dr. Mormol. (Tr. 138-140.)  The ALJ does not reference any of the other state agency physician opinions in this case, i.e., the opinions of Drs. Haskins, Tangeman, and Voyten.  Nor does the ALJ provide further discussion or evaluation of any of the state agency opinions at any point in the decision, either generally or specifically with respect to the domain

37

of Caring for Yourself.

The Court finds the ALJ's analysis of the opinions of Drs. Tischler and Mormol does not cure his failure to sufficiently analyze and evaluate the evidence regarding D.A.'s functioning in the domain of Caring for Yourself.  First, the ALJ does not clearly explain why he accorded "some weight" to these opinions, nor does he articulate which specific opinions *vis a vis* the six domains deserved some weight or to what degree.  The ALJ states only that "these opinions do deserve some weight, particularly in a case like this in which there exist a number of other reasons to reach similar conclusions."  (Tr. 56.)  The ALJ never explains, however, what the "other reasons" are, or identifies what particular domains these "other reasons" relate to.  Thus, it is unclear to this Court what aspects of Drs. Tischler's and Dr. Mormol's opinion were accorded "some weight" by the ALJ or why.

The Court also notes that Dr. Tischler's opinion D.A. had "no limitation" in the domain of Caring for Yourself was rendered in December 2013.  (Tr. 139-140.)  The record contains a great deal of evidence subsequent to that date regarding D.A.'s serious difficulties in this domain.  Most notably, treatment notes indicate D.A. attempted to strangle herself with a belt in July 2014; repeatedly refused to take her medications in 2014 and 2015; and was suspended four times during the 2014-2015 school year for, among other things, flipping over a chair in anger and leaving an assigned area and not returning.  (Tr. 357-358, 450, 464, 478, )  Dr. Tischler reached his opinion regarding D.A.'s limitations in the domain of self-care without the benefit of this evidence.  While the ALJ remarks generally that "[t]he updated evidence changed the assessment somewhat," he fails to identify what "updated evidence" he is referring to or explain whether or to what extent it "changed the assessment" with respect to the domain of

38

Caring for Yourself.  *See Tyson v. Comm'r of Soc. Sec.*, 2017 WL 1130028 at * 5 (W.D. Mich.

March 27, 2017) ("[T]he issue remains regarding the ALJ's evaluation of the new evidence,

including the testimony at the hearing, and his modification to Dr. Schirado's opinion.  The

Commissioner must provide a statement of evidence and reasons on which the decision is

based. See 42 U.S.C. § 405(b)(1). . . . The ALJ has not identified the new evidence or explained

how such new evidence, including the testimony from plaintiff's mother and Ms. Rasmus,

caused him to modify Dr. Schirado's opinion.  Accordingly, this matter will be reversed and

remanded pursuant to 42 U.S.C. § 405(g).")

        The teacher questionnaires identified by the Commissioner are similarly outdated.  It is

true that neither Ms. Wampleman or Ms. Cornell found D.A. had any "serious" or "very

serious" problems in the domain of Caring for Yourself.  (Tr. 251, 262.)  These questionnaires,

however, were completed in October and November 2012, when D.A. was in first and second

grade.  (*Id.*)  As discussed above, the record reflects D.A. demonstrated serious difficulties in

the area of Caring for Yourself subsequent to these questionnaires.  Indeed, D.A.'s fourth grade

teacher, Ms. Sommer, specifically noted D.A. "does not adapt well to change in her

environment" and indicated she had been suspended four times during the 2014-2015 school

year for (among other things) flipping over a chair in anger and leaving an assigned area and not

returning, each of which are arguably relevant to her ability to follow safety rules and respond

to circumstances in safe and appropriate ways.  (Tr. 348, 357-358.)

        In sum, the Court finds the ALJ's reliance on the opinion evidence discussed above does

not cure his failure to sufficiently analyze the evidence relevant to D.A.'s limitations in the

domain of Caring for Yourself.  Courts within this Circuit have not hesitated to remand where

39

an ALJ fails to adequately discuss the record and explain the basis for his decision that a child does not have a marked limitation in one of the six domains. *See e.g., Finney, o.b.o. C.F. v. Comm'r of Soc. Sec.*, 2016 WL 2996623 at * 4 (W.D. Mich. May 25, 2016) (remanding for a "proper analysis of the functional domains" where the ALJ failed to "connect the dots" as it relates to the evidence she relied on to support her conclusion that the claimant had a less than marked limitation in the domain of Caring for Yourself); *Hinkle, o.b.o. R.H. v. Comm'r of Soc. Sec.,* 2016 WL 4150648 at * 3-4 (W.D. Mich. Aug. 5, 2016) (remanding for further consideration of domain of Caring for Yourself where "[d]espite the fact that this particular domain concerns a variety of behaviors and skills, the ALJ failed to address the evidence in any meaningful way . . ."); *Woodall v. Colvin*, 2013 WL 4710516 at * 15 (N.D. Ohio Aug. 29, 2013) (finding functional equivalence analysis in the domain of Caring for Yourself inadequate where the ALJ "did not delve into the other areas of this domain which are relevant to the instant case, including Claimant's ability to control himself and cope with stress and changes in the environment . . ."); *Shannon ex rel. K.J.S. v. Astrue*, 2013 WL 149819 (N.D. Ohio Jan.14, 2013) (finding ALJ committed error by not addressing claimant's anger, aggression and ability to control his emotions and respond to stress in the domain of Caring for Self, although case not remanded because substantial evidence supported ALJ's findings that claimant was less than marked in all other domains).

As another district court within this Circuit recently explained:

This is not to say that the ALJ was in error to give weight to the expert's opinion especially where — as here — the opinion was uncontroverted. **What is missing here is a discussion of the record and a connection of the record to the ALJ's conclusions, such that the Court might determine whether the conclusion is supported by substantial evidence.** The Commissioner notes that the Court may view the ALJ's discussion as a whole, however, "the ALJ's

decision still must say enough to allow the appellate court to trace the path of [her] reasoning." *Stacey v. Comm'r of Soc. Sec.*, 451 Fed.Appx. 517, 519 (6th Cir. 2011) (internal quotation marks omitted).  **"[W]hile the ALJ's decision contains an extensive recitation of the evidence in the record, [she] did not connect the dots as it relates to the evidence [she] relied on to support [her] conclusions."**  *Sewell ex rel. HMC v. Comm'r of Soc. Sec.*, No. 10-12520, 2011 WL 3566471, at *8 (E.D. Mich. July 20, 2011), *report and recommendation adopted Sewell v. Comm'r of Soc. Sec.*, No. 10-12520, 2011 WL 3566401 (E.D. Mich. Aug. 12, 2011).  On the record here, the Court is unable to trace the path of the ALJ's reasoning and so cannot conclude whether substantial evidence supports the ALJ's conclusion.  Accordingly, this case must be remanded for a proper analysis of the functional domains.

*Finney*, 2016 WL 2996623 at * 4 (emphasis added).

Here, the ALJ failed to "connect the dots" as to the evidence he relied on to support his conclusion that D.A. had less than marked limitations in the domain of Caring for Yourself. Accordingly, it is recommended this matter be remanded for a thorough analysis of this domain.

## VII.  Conclusion

For the foregoing reasons, the Court finds the decision of the Commissioner is not supported by substantial evidence.  Accordingly, it is recommended the decision of the Commissioner be VACATED and the case REMANDED for further consideration consistent with this decision.

Date: July 28, 2017                                        s/ *Jonathan D. Greenberg*
                                                          Jonathan D. Greenberg
                                                          U.S. Magistrate Judge

## OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United***

*States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).